UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

MELVIN ALONZO KEY,

                Plaintiff,                **MEMORANDUM & ORDER**

      – against –                13-CV-364 (SLT)

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
------------------------------------------------------------x

**TOWNES, United States District Judge:**

Pro se plaintiff Melvin Alonzo Key brings this action pursuant to Section 405(g) of the

Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying his applications

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The

Commissioner moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Plaintiff

has not opposed the motion. For the reasons set forth below, the Commissioner's motion is

granted.

I.      **PROCEDURAL HISTORY**

Plaintiff filed applications for DIB and SSI on May 3, 2010. (R. 121-32). He alleged

that he had been disabled since November 23, 2008, due to HIV and hepatitis C. (R. 126, 170-

71). His applications were denied on July 23, 2009, (R. 40, 41, 50-57), and he requested a

hearing before an administrative law judge ("ALJ"), (R. 59-60).

On July 8, 2011, ALJ Wallace Tannenbaum dismissed Plaintiff's request because he

failed to appear for the scheduled July 5, 2011, hearing. (R. 42-46). On March 1, 2012, the

Appeals Council remanded the matter and directed the ALJ to schedule another hearing because

Plaintiff had demonstrated good cause for failing to appear. (R. 47-49).

On August 7, 2012, ALJ Margaret A. Donagy held a hearing at which Plaintiff, who was not represented, was the only testifying witness. (R. 20-39). ALJ Donagy issued a decision on September 5, 2012, in which she concluded that Plaintiff was not disabled within the meaning of the Act. (R. 6-19). On November 15, 2012, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. (R. 1-3). Plaintiff timely commenced this action on January 18, 2013, proceeding pro se. On January 17, 2014, the Commissioner filed, with permission of the Court, its unopposed motion for judgment on the pleadings pursuant to Rule 12(c), after Plaintiff was given notice and nevertheless failed to respond. (See Docket Nos. 11-15).

II.     **RELEVANT FACTS**

A.     **Nonmedical Evidence**

Plaintiff was born on March 3, 1964. (R. 27). He completed high school and approximately one year of college coursework. (R. 27, 171). From 1993 to 2007, Plaintiff worked as a laborer. (R. 172). During the same period, Plaintiff also worked at retail stores in marketing, sales, as a receiving clerk, and with visual displays. (R. 172). His duties variously included assembly line work, packing boxes, lifting products, building backdrops, unloading trucks, stocking store shelves, moving fixtures, setting up store window displays, and operating a cash register, computer, and price gun. (R. 190-95). In all of these positions, Plaintiff stated somewhat confusingly that the heaviest weight he lifted was 20 pounds, but that he "frequently" lifted 25 pounds (and as much as 50 pounds at his sales job). (R. 190-95).

Plaintiff reported that he stopped working on November 23, 2008, at the age of 44, due to hepatitis C and HIV infections. (R. 170-71). As of May 20, 2010, the date he applied for benefits, Plaintiff reported that he was living in a shelter and that he could dress, bathe, shave,

and take care of his other personal needs. (R. 178-80). He wrote that on a daily basis he would take a shower, get dressed, walk around Central Park, sit on a bench, then go to the library to use the computers. (R. 179). Plaintiff reported that he was able to walk for about an hour at a time before he would stop and sit "not long" before continuing. (R. 184). He also indicated that he remembered to take his medications, was able to prepare his meals, clean his room, manage his laundry, walk outside, shop for food every other day, and use public transportation. (R. 180-82). His hobbies included reading magazines, drawing, and hand sewing, which he did approximately once a week. (R. 182). However, Plaintiff stated that he felt depressed and "tired all the time," uninterested in hobbies. (R. 182). Although he could follow spoken and written instructions, he reported that he never finished what he started, had problems paying attention, and that his mind was always wandering. (R. 184). He stated that he experienced dizziness, lack of appetite, and ringing or "train sounds" in his ears from his medication. (R. 186). Plaintiff also described pain in the bottom of his left foot, in his right knee, and between his shoulder blades. (R. 186). He reported taking Atripla,[1] but no medication for pain. (R. 187).

At the August 7, 2012, hearing before the ALJ, Plaintiff testified that he lived alone in a one bedroom apartment, paid for by an association that provides supportive housing for people with HIV. (R. 28). He stated that he stopped drinking in March 2012, last used marijuana six months earlier, and last used cocaine one year earlier. (R. 29). Plaintiff testified that in 2010 he was fired from his most recent job at a furniture store "[b]ecause I had social skills with the other employees and stuff like that, I had mood swings, stuff like that." (R. 30). He stated that he believed he became disabled:

---

[1] Atripla is a prescription medicine approved by the U.S. Food and Drug Administration for the treatment of HIV infection in adults. Atripla contains three anti-HIV drugs which, in combination, help block an HIV enzyme, preventing HIV from replicating and lowering the amount of HIV in the blood. Atripla is prescribed alone as a complete treatment regimen or together with other anti-HIV medicines. See http://aidsinfo.nih.gov/drugs/424/atripla/0/patient (last visited Feb. 25, 2014).

Because of the disease that I have, the HIV and then Hepatitis C, and then out of – I don't know if it's due to the medication and stuff that I was taking I was diagnosed with high blood pressure, and then they told me that I had a bad heart that I had an irregular heart beat, and a lot of times when I'm out and about, climbing stairs or just walking around, my heart just all of a sudden starts racing and I have to like sit down and before I didn't even know, I didn't even have these symptoms.

(R. 32). Plaintiff stated that his HIV medication caused nausea, dizziness, and "excessive diarrhea." (R. 34). With regard to his hepatitis C, Plaintiff said that a recent liver biopsy had shown "some damage." (R. 33). He also testified that he met with a psychiatrist at Belleview Hospital ("Belleview") who prescribed Lexapro[2] for his mood swings, but that Plaintiff – on his own – discontinued the medication after two months because he was "more concerned about everything that I took that would flush through my liver to make my liver bad." (R. 33-34).

Plaintiff testified that on some days he could walk from Brooklyn to Manhattan, while on other days his "heart gets to racing and speeding" and he could walk no more than four or five blocks. (R. 35-36). He did not have trouble sitting or standing, except dizziness if he stood up too fast. (R. 36). He also stated that he had no problem lifting or carrying items, preparing his meals, washing dishes, doing his laundry, or with his personal care. (R. 36, 37). Plaintiff indicated that he had a driver's license, but did not drive or ride a bicycle because his doctors told him he could get dizzy and cause an accident. (R. 36). He testified that he used public transportation. (R. 37). Plaintiff also indicated that all of his medical treatment took place at Bellevue. (R. 35).

### B. Medical Evidence

On January 4, 2010, Plaintiff was treated at the Belleview emergency room for a dental abscess, where he denied taking any medication. (R. 362). On January 28, 2010, Plaintiff

---

[2] Lexapro is a selective serotonin reuptake inhibitor used to treat depression and generalized anxiety disorder. See http://www.nlm.nih.gov/medlineplus/druginfo/med http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html s/a603005.html (last visited Mar. 20, 2014).

4

returned to the emergency room with a cough and sore throat, complaining of approximately three episodes of diarrhea per day. (R. 358-59). His assessment report noted that he had a history of HIV, hepatitis B, and hepatitis C, with no history of AIDS defining illnesses, and had not seen a doctor or had taken a white blood cell count for two years. (R. 358-59). The report further indicates no clinical or cardiac findings or abnormalities. (R. 359). Plaintiff's chest x-rays were also negative. (R. 360, 510). Plaintiff received a diagnosis of "viral syndrome" and scheduled a follow-up appointment in the virology clinic. (R. 361).

Testing performed on February 1, 2010, confirmed Plaintiff's HIV status. (R. 353, 357). On February 17, 2010, Plaintiff reported for an initial virology clinic visit to perform an "HIV Annual Comprehensive" exam and establish care. (R. 257-59). Dr. Rena McDermott noted that Plaintiff had been diagnosed with HIV three years earlier and had no opportunistic infections. (R. 257, 258). Plaintiff complained of tooth pain, blurry vision, right knee pain from a basketball injury three years earlier, hemorrhoidal pain, and diarrhea for three weeks with flatus. (R. 257). Plaintiff reported that he had an appetite and was tolerating food without nausea or vomiting. (R. 257). The report also indicates that Plaintiff was not taking any medication. (R. 257). On examination, Plaintiff had full range of motion, no skin lesions, no abnormal cardiac or respiratory findings, and he denied fever or night sweats. (R. 260). Blood tests performed that day showed Plaintiff's total CD3 count was 1265 at 86 percent; CD4 count was 377 at 26 percent; CD8 count was 847 at 57 percent; and the CD4/CD8 ratio was .445.[3] (R. 245). Dr. McDermott diagnosed Plaintiff with asymptomatic HIV. (R. 258).

---

[3]    The HIV virus uses immune system cells called CD4 cells or T-cells to make copies of itself and destroys these cells in the process. A normal CD4 count is between 500 and 1,600 cells per cubic millimeter of blood ("cc/mm3"). See http://www.cdc.gov/hiv/basics/ whatishiv.html (last visited Mar. 17, 2014). A person whose CD4 cell count falls below 200 cells/mm3 is considered to have progressed to AIDS. The diagnosis can also occur if a person develops one or more opportunistic illnesses, regardless of the CD4 count. See http://www.cdc.gov/hiv/basics/whatishiv.html (last visited Mar. 17, 2014).

On February 24, 2010, when Plaintiff returned for his test results, he complained of the same symptoms: blurry vision, right knee pain, "episodic" diarrhea, and tooth pain. (R. 255). Dr. McDermott diagnosed asymptomatic HIV, hepatitis C, a vitamin deficiency, and syphilis. (R. 256). Dr. McDermott prescribed vitamin D and calcium tablets, indicated plans to start Plaintiff on antiretroviral therapy ("ART"), and ordered further testing. (R. 256). The tests showed Plaintiff's viral load was greater than 600 IU/mL.[4] (R. 241).

X-rays taken February 26, 2010, of Plaintiff's right knee showed no evidence of displaced fracture of the shaft of the tibia or fibula, nor large skin or soft tissue defects, but showed evidence of "compartment osteoarthritis" of the femur and tibia, as well as an "avulsion fracture of the lateral tibial plateau likely a Segond fracture in the setting of prior ACL injury"

---

The U.S. Department of Health and Human services suggests starting treatment when the CD4 count falls below 350 cells/mm3 because opportunistic diseases typically begin to affect people at that level. See http://aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/ (last visited Mar. 17, 2014).

The CD4 percentage measures how many of the body's white blood cells are actually CD4 cells. The percentage provides a more stable count over a long period of time, but the CD4 count is typically a better measure of immune function. See http://aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/types-of-lab-tests/index.html (last visited Mar. 17, 2014).

In contrast, CD8 cells are "suppressor" cells that end the immune response and can also kill cancer cells and cells infected with a virus. Normal CD8 counts are between 375 and 1100. In healthy people, the ratio of CD4 cells to CD8 cells is between 0.9 and 1.9. In people with HIV infection, the ratio can drop dramatically, meaning there are instead many times more CD8 cells than CD4 cells. http://www.aids.org/topics/aids-factsheets/aids-background-information/what-is-aids/hiv-testing/cd4-t-cell-tests/ (last visited Mar. 17, 2014).

[4]     In the context of hepatitis C, viral load does not seem to correlate with disease severity or prognosis. Because the significance of absolute values is unclear, clinical decisions tend to be made based on "high" or "low" viral load, rather than on exact levels. Generally, the cut off between high and low is approximately 800,000 IU/mL. See http://www.hepatitis.va.gov/provider/reviews/laboratory-tests.asp (last visited Mar. 17, 2014).

and a "well corticated ossification proximal to the tibial tubercle related to . . . Osgood

Schlatter's disease."[5]  (R. 263).

On March 5, 2010, Plaintiff visited case manager Maritza Molina at Bellevue.  (R. 260-

61).  Plaintiff complained of weight loss and sought a dental and opthomological referral.  (R.

260).  He indicated that he was not taking HIV medication and denied any history of mental

illness or substance abuse.  (R. 261).  Plaintiff stated that he has little contact with his family and

asked for assistance to relocate from a shelter to supportive housing in a one-bedroom apartment

in Manhattan or the Bronx.  (R. 261).

On March 9, 2010, Plaintiff returned to the Bellevue emergency room and requested a

psychiatric evaluation.  (R. 354).  The report notes that Plaintiff had no pain issues and was

taking no medications, but provides no further information.  (R. 354).

On March 24, 2010,  Plaintiff met with Dr. McDermott at the virology clinic to discuss

his treatment.  (R. 247, 253-254).  Dr. McDermott noted that Plaintiff had no HIV opportunistic

infections, had a history of syphilis and hepatitis C, and planned to initiate ART therapy that day.

(R. 253).  She noted that Plaintiff's recent CD4 count was 377 and viral load was 50,900. [6]  (R.

247).  Plaintiff stated that he "rides a bicycle about 12 hrs daily."  (R. 253).  Dr. McDermott

indicated that Plaintiff wished to proceed with Atripla, taken at bedtime, and also discussed the

side effects, such as dizziness and vivid dreams.  (R. 253).  Dr. McDermott noted that an

---

[5]     "An avulsion fracture occurs when a tendon or ligament, along with a piece of the bone
it's attached to, gets pulled away from the main part of the bone."  http://www.mayoclinic.org/
avulsion-fracture/expert-answers/faq-20058520 (last visited Mar. 19, 2014).  "Osgood-Schlatter
disease is an overuse injury that occurs in the knee area of growing adolescents. It is caused by
inflammation of the tendon below the kneecap (patellar tendon) where it attaches to the shinbone
(tibia)."  http://orthoinfo.aaos.org/topic.cfm?topic=a00411 (last visited Mar. 19, 2014).

[6]     In the context of HIV infection, viral load measures the level of HIV in the blood. This
measurement helps physicians monitor the disease, decide when to start treatment, and determine
whether HIV medications are working.  The goal of HIV treatment is to help reduce viral load to
undetectable levels.  See http://aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-
your-test-results/viral-load/ (last visited Mar. 17, 2013).

abdominal sonogram was pending with regard to Plaintiff's hepatitis C infection.  (R. 254).  The sonogram, submitted on March 26, 2010, showed no liver abnormalities, a mildly enlarged spleen, and unremarkable gallbladder and biliary tree.  (R. 262).

On April 21, 2010, Plaintiff returned to the virology clinic for a follow-up to discuss his medication.  (R. 385).  Dr. McDermott reported that Plaintiff complained of dizziness in the morning since starting Atripla, but said it dissipated within one hour and he was otherwise tolerating the drug "without difficulty."  (R. 385).  Plaintiff's physical exam was normal and he agreed to continue with his once-a-day Atripla regimen.  (R. 385).

On May 19, 2010, Plaintiff had another follow-up at the virology clinic.  (R. 271-72).  Dr. McDermott reported that Plaintiff was frustrated by a recent dental visit and that he separately inquired about options to quit smoking.  (R. 271).  Dr. McDermott noted that she would give him a nicotine patch.  (R. 271).  Plaintiff stated that he still had dizziness in the morning, but that "sporadic episodes of diarrhea decreased in frequency/volume."  (R. 271).  Nausea was intermittent with no vomiting or abdominal pain.  (R. 271).  Plaintiff was frustrated and uncooperative during the visit and declined to have a physical exam.  (R. 271).  He wanted to continue taking Atripla and Dr. McDermott indicated that a visit would be planned with sports medicine to assess his "unspecified injury to knee, leg, ankle, and foot."  (R. 272).

On May 20, 2010, Plaintiff went to Bellevue for an unscheduled visit with case manager Erica Martinez.  (R. 403-05).  Ms. Martinez noted Plaintiff's February 17, 2010, lab results and that Plaintiff was taking Atripla with "no side effects."  (R. 403).  She also indicated that Plaintiff was seeing a nutritionist for weight loss and poor appetite, and that Plaintiff had been compliant with all medical treatment.  (R. 403).  Plaintiff stated that he had no history of mental illness, but would be interested in attending group or one-on-one therapy.  (R. 403).  He said that he had a

history of alcohol and cocaine use when he lived in Texas in 1994, but had completed rehab and been sober since 2004. (R. 404).

On June 3, 2010, in response to a request from the New York State Office of Temporary and Disability Assistance, Dr. Judith A. Aber, director of virology at Bellevue, wrote that Plaintiff had hepatitis C with abnormal liver function, a work-up of diarrhea was in progress, and that hopefully the diarrhea would resolve with ART for his HIV. (R. 267).

On June 16, 2010, Plaintiff saw Dr. McDermott at the virology clinic for a follow-up. (R. 381-82). In addition to Atripla, Plaintiff had started on a nicotine patch. (R. 381). Plaintiff complained of intermittent diarrhea, two to three days a week, sometimes bloody which he attributed to hemorrhoids. (R. 381). Plaintiff reported that his dizziness was resolved and that his appetite improved later in the day. (R. 381). Dr. McDermott again diagnosed asymptomatic HIV infection, noted that Plaintiff's lab results showed "good response" to Atripla and that Plaintiff was scheduled for a visit with sports medicine the following month to assess his chronic knee pain. (R. 382).

On July 28, 2010, Plaintiff saw Drs. Gregory Tayrose and Brian Park at the Bellevue sports medicine clinic. (R. 423-24). Plaintiff complained of two months of increasing right knee pain, stating that he injured the knee six years earlier playing basketball. (R. 423). Plaintiff said he never saw a doctor about the injury and that he had additional pain in the past two months because he "increased his physical activity." (R. 423). Plaintiff stated that he was an "avid runner and cyclist[]," but he could not perform lateral movements due to knee instability. (R. 423). He said that he had not tried any medication to relieve the pain, but that he had been "drinking heavily to help." (R. 423). On examination, the right knee had significant joint

effusion, no jointline tenderness, was stable to stress, and had a positive Lachman's test.[7] (R.

423). X-rays showed a well corticated osseous fragment compatible with prior Osgood-

Schlatter's disease, minimal overlying soft tissue swelling, mild joint space loss,

chondrocalcinosis[8] within the medial femorotibial compartment, and a small right knee joint

effusion. (R. 507). The doctors aspirated synovial fluid[9] from Plaintiff's right knee, injected

Kenalog with Lidocaine, administered ibuprofen, and fit Plaintiff for an ACL stabilizing brace.

(R. 423). Plaintiff was scheduled for a follow-up in two months. (R. 424).

On July 29, 2010, Plaintiff returned to Bellevue for an evaluation of his hemorrhoids. (R.

371-72). Physician Assistant Jyoti Narang reported that Plaintiff complained of a prolapse of

hemorrhoids and rectal bleeding. (R. 371). On examination, PA Narang found internal

hemorrhoids, but no external hemorrhoids, no fistula, no fissure, and no anal condyloma.[10] (R.

371), Plaintiff was scheduled for a hemorrhoidectomy and prescribed a stool softener. (R. 372).

Plaintiff's pre-surgical chest X-rays were normal, (R. 506), and on November 1, 2010, Dr.

Harvey Moore performed a stapled hemorrhoidectomy, (R. 303-07; 460).

---

[7]     Lachman's test is used to determine whether a patient has suffered a tear of the anterior
cruciate ligament ("ACL"). See http://www.fpnotebook.com/Ortho/Exam/LchmnTst.htm (last
visited on Mar. 19, 2014).

[8]     Chondrocalcinosis is defined as the presence of calcium salts, especially calcium
pyrophosphate in the cartilaginous structures of one or more joints. Dorland's Illustrated
Medical Dictionary 32nd Ed., 2012, at 230.

[9]     "Synovial fluid is normally a thick, straw-colored liquid found in small amounts in joints,
bursae (fluid-filled sacs in the joints), and tendon sheaths . . . . The test can help diagnose the
cause of pain, redness, or swelling in joints. Sometimes, removing the fluid can also help relieve
joint pain." http://www.nlm.nih.gov/medlineplus/ency/article/003629.htm (last visited Mar. 19,
2014).

[10]    "Anal condyloma acuminatum is a human papillomavirus . . . that affects the mucosa and
skin of the anorectum and genitalia." http://www.ncbi.nlm.nih.gov/pubmed/19820442 (last
visited Mar. 19, 2014).

On December 1, 2010, lab reports showed Plaintiff's CD3 count was 925 at 82 percent; CD4 count was 390 at 34 percent; CD8 count was 530 at 47 percent; and CD4/CD8 ratio was .736. (R. 466).

On March 16, 2011, Plaintiff saw Dr. McDermott at the Bellevue virology clinic for a routine follow-up. (R. 420-21). Dr. McDermott noted that Plaintiff was "in good spirits," was taking Atripla and "doing well." (R. 420, 421). Plaintiff denied drug use since December 2010, said he still smoked about five cigarettes a day, was interested in the nicotine patch, and had no new complaints. (R. 420). The report indicates that Plaintiff was fitted for an ACL brace at his orthopedic appointment, but he "became frustrated with the doctors and walked out of the clinic before being see[n]." (R. 420). Dr. McDermott discussed undergoing a workup, including a liver biopsy, for possible hepatitis C treatment. (R. 421). She scheduled an abdominal ultrasound, diagnosed asymptomatic HIV infection, and scheduled Plaintiff for a return visit in two weeks. (R. 421). The March 18, 2010, abdominal ultrasound showed "essentially stable findings" with no focal liver mass identified. (R. 505).

On May 4, 2011, Plaintiff met with Dr. Joseph Lux, a psychiatrist affiliated with the virology clinic at Bellevue. (R. 431-33). Plaintiff stated that he sometimes felt depressed when he woke in the morning and did not want to get out of bed. (R. 431). Plaintiff complained of anhedonia,[11] poor sleep, and poor appetite for the past year, but denied any suicidal ideation or history of psychotic or manic symptoms. (R. 431). Plaintiff reported having an "occasional beer," that he last used marijuana one week earlier and cocaine more than a month earlier. (R. 431). Plaintiff stated that he had a prior history of excessive alcohol use, resulting in rehab treatment for 90 days followed by two years of outpatient treatment in 2001. (R. 431). For Axis

---

[11]     Anhedonia is defined as "a psychological condition characterized by inability to experience pleasure in normally pleasurable acts." http://www.merriam-webster.com/ dictionary/anhedonia (last visited Mar. 19, 2014).

I, Dr. Lux diagnosed questionable mild depressive disorder versus depressive disorder not otherwise specified and polysubstance abuse in partial remission; Dr. Lux deferred an Axis II diagnosis; for Axis III, he diagnosed HIV and hepatitis C; for Axis IV, he diagnosed "health"; and for Axis V, he noted a GAF score of 45. (R. 432).[12] Dr. Lux recommended and prescribed a trial of Lexapro to optimize Plaintiff's mood symptoms prior to his upcoming interferon treatment. (R. 432). Plaintiff stated that he planned to enroll in substance abuse counseling in Brooklyn and Dr. Lux discussed the importance of abstaining from alcohol for his liver because of the hepatitis C infection. (R. 433). Plaintiff subsequently failed to attend his follow-up psychiatric appointments. (R. 433, 434).

Also on May 4, 2011, Plaintiff saw Dr. McDermott for a follow-up appointment at the virology clinic. (R. 418-19). Plaintiff was stable on Atripla and indicated he wished to get a liver biopsy and was interested in hepatitis C treatment. (R. 418). Dr. McDermott diagnosed Plaintiff with asymptomatic HIV infection, stable on Atripla, and chronic hepatitis C infection. (R. 419). She scheduled a liver biopsy for May 12, 2011, and a follow-up visit for three months later. (R. 419).

On May 12, 2011, Plaintiff had a core liver biopsy of the right lobe. (R. 312-52; 481-82; 504). The biopsy showed "chronic hepatitis, with mild lobular activity (Grade 1) and portal fibrosis (Stage 1)." (R. 481). There were no complications and Plaintiff was instructed to limit his physical activity for twelve hours. (R. 312, 319). Plaintiff departed the same day against medical advice. (R. 336-37).

---

[12] The DSM-IV multiaxial scale assesses an individual's mental and physical condition on five axes. Axis I refers to clinical disorders; Axis II refers to personality disorders; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V represents a global assessment of functioning ("GAF"). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 4th Ed., Text Revision (2000), at 27-37. A GAF in the range of 41 to 50 signifies "serious symptoms . . . or any serious impairment in social, occupational, or school functioning . . ." Id. at 34.

On August 3, 2011, Plaintiff saw Dr. Rebecca Summers at the Bellevue virology clinic for a follow-up appointment. (R. 415-17). She noted that his liver biopsy demonstrated chronic hepatitis and portal fibrosis Stage 1. (R. 415). Plaintiff reported that he self-discontinued Lexapro 20 days after the psychiatrist's prescription because he became nauseated. (R. 415). He indicated that he was hesitant to start a hepatitis C treatment. (R. 415). Plaintiff stated that he had followed the Atripla regimen and, although it caused dizziness and headaches where he felt his "head [was] going to pop," the overall symptoms had improved and he did not wish to change the regimen. (R. 415). Dr. Summers also noted that Plaintiff had cut down significantly on his drinking from at least one six-pack of beer daily to one or two times per month and that he quit smoking in March 2011. (R. 415). Plaintiff reported no visual changes, headaches (after discontinuing Lexapro), irregular bowel movements, rectal bleeding, difficulty swallowing, fever/chills, or night sweats. (R. 415). Plaintiff complained of pain in his right knee, but said he was "able to bike" and was not taking analgesics. (R. 415). Physical exam was normal. (R. 416). Dr. Summers indicated that Plaintiff would continue with Atripla and follow-up with Dr. Lux for anti-depressive treatment. (R. 416, 417). Lab tests that day showed Plaintiff's CD4 count was 643 at 37 percent; CD8 count was 768 at 44 percent; and CD4/CD8 ratio was .838. (R. 488).

On January 11, 2012, Plaintiff saw Nurse Practitioner Rebecca Fry at the Bellevue virology clinic for a routine follow-up. (R. 412-16). NP Fry noted that Plaintiff's HIV was stable on Atripla as of his last visit with an undetectable viral load. (R. 412). Plaintiff stated that he missed one week of Atripla two months earlier due to a change in his insurance coverage and pharmacy. (R. 412). He reported experiencing an Atripla "hangover" in the mornings, but found it "manageable" by taking the medication without food. (R. 412). Plaintiff described increased eating and drinking over the holidays, including two to three large cans of beer each day, as well

as marijuana use.  (R. 412).  He complained of ringing in his ears and epigastric burning before meals, but denied depressed mood or anxiety.  (R. 412).  Plaintiff reported going to the gym "regularly" and showed interest in going back to school.  (R. 412).  On examination, Plaintiff was "jittery" and had a "slight tremor" in his hands, as well as tongue fasticulations.  (R. 413).  NP Fry diagnosed asymptomatic HIV infection, unspecified knee injury, toxic tobacco effect, and gastritis without mention of hemorrhage.  (R. 413).  NP Fry assessed that Plaintiff's gastritis was likely the result of smoking and alcohol abuse.  (R. 413).  She dispensed nicotine patches and gum, refilled Plaintiff's Atripla prescription, and recommended that a future visit be devoted entirely to the impact of Plaintiff's substance abuse on his chronic hepatitis C.  (R. 414).

On April 25, 2012, Plaintiff saw NP Fry for a follow-up and monitoring lab work.  (R. 409-11).  Plaintiff reported missing approximately two to three doses of Atripla per week, drinking two 25 ounce cans of beer daily, and "needing eye-opener."  (R. 409).  He was interested in naltrexone, but uninterested in counseling or other assistance.  (R. 409).  A trial of omeprazole was working well for his prior complaint of gastritis.  (R. 409).  Plaintiff reported decreased appetite, disturbed sleep, vivid dreams and fatigue after taking Atripla, as well as mild headaches, nausea, dizziness, and epigastric pain.  (R. 409).  On examination, Plaintiff had elevated blood pressure, slight tremor, patchy hyperpigmentation of the tongue and pharynx, and an irregular heart rate.  (R. 410).   NP Fry diagnosed continuous alcohol abuse, chronic hepatitis C, asymptomatic HIV infection, gastritis, and high blood pressure without hypertension.  (R. 410-11).  Plaintiff declined harm reduction services with regard to his substance abuse.  (R. 410).  NP Fry and Plaintiff discussed a possible switch to another medication if the side effects from Atripla were the cause of non-adherence to treatment, but NP Fry suspected that alcohol use was the cause.  (R. 411).  She noted that she would prepare an SSI letter with a medical summary, but that Plaintiff "is not disabled by HIV or [hepatitis C]."  (R. 412).  Lab tests that day showed

Plaintiff's CD3 count was 995 at 75 percent; CD4 count was 449 at 34 percent; CD8 count was 536 at 41 percent; and CD4/CD8 ratio was .836.  (R. 296).

By letter dated April 27, 2012, NP Fry reported that Plaintiff was non-compliant with his HIV regimen, but that his bloodwork was "supportive of control."  (R. 292).  NP Fry also stated that Plaintiff was never treated for his hepatitis C and that he was a "poor candidate" for treatment because of alcohol abuse.  (R. 292).  She noted Plaintiff's hypertension, likely secondary to alcohol abuse, as well as nicotine dependence and gastritis.  (R. 292).  She listed Plaintiff's current medications as Atripla, Esomeprazole, and Vitamin B.  (R. 292).

On May 16, 2012, Plaintiff saw NP Fry and said that he was compliant with his HIV medication "100% lately" and no missed doses since his last visit.  (R. 407).  Plaintiff stated that "the only reason I have not had a drink yet today is that I was coming to see you."  (R. 406).  He reported jitteriness and continuing need for an "eye opener," and ascribed his increased alcohol abuse to a recent decrease in physical activity, no work, and hanging out with friends.  (R. 406).  He complained of headaches with mild dizziness for several weeks with nosebleeds lasting approximately ten minutes in the past week.  (R. 406).  NP Fry noted Plaintiff's elevated blood pressure, and commented that his diet was high in ramen noodles, bacon, ham, and other processed foods, and that he continued to smoke.  (R. 406).  NP Fry reported that Plaintiff's EKG was abnormal, but Plaintiff denied chest pains, shortness of breath, fatigue, or exercise intolerance – to the contrary, NP Fry noted that Plaintiff "exercises regularly, although less over last several weeks."  (R. 406).  On examination, Plaintiff was alert, slightly sweaty, had jittery eyes, hyperpigmentation of buccal mucosa, and mild erythema of pharynx.  (R. 407).  NP Fry diagnosed asymptomatic HIV infection, chronic hepatitis C, continued alcohol abuse, hypertension (likely secondary to alcohol use), toxic effect of tobacco, and constipation

alternating with diarrhea.  (R. 408).  They agreed to continue treatment with Atripla, HCTZ[13],

and Metamucil, but Plaintiff declined services or counseling for alcohol detoxification.  (R. 408).


III.    DISCUSSION

    A.    Standard of Review

    In reviewing the ALJ's decision, "it is not [this Court's] function to determine de novo

whether plaintiff is disabled."  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (internal

quotation marks and citation omitted).  "Rather, [this Court] must determine whether the

Commissioner's conclusions are supported by substantial evidence in the record as a whole or

are based on an erroneous legal standard."  Id. (internal quotation marks and citation omitted);

accord Jordan v. Comm'r of Social Security, 194 Fed. App'x 59, 61 (2d Cir. 2006) ("We review

the agency's final decision to determine, first, whether the correct legal standards were applied

and, second, whether substantial evidence supports the decision.") (internal citation omitted); see

also 42 U.S.C. § 405(g).  Substantial evidence has been defined as "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  Schaal, 134 F.3d at 501

(quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted);

accord Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).  "To determine whether the [ALJ's]

findings are supported by substantial evidence, the reviewing court is required to examine the

entire record, including contradictory evidence and evidence from which conflicting inferences

can be drawn."  Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (internal quotations marks and

citation omitted).  "When there are gaps in the administrative record or the ALJ has applied an

improper legal standard," remand to the Commissioner "for further development of the

---

[13]     "Hydrochlorothiazide, a 'water pill,' is used to treat high blood pressure and fluid
retention caused by various conditions, including heart disease. It causes the kidneys to get rid of
unneeded water and salt from the body into the urine." http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a682571.html (last visited Mar. 20, 2014).

evidence" or for an explanation of the ALJ's reasoning is warranted.  Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

**B.      Analysis for Disability Determinations**

The Social Security regulations "establish a five-step process" pursuant to which "the Commissioner is required to evaluate a claim for disability benefits."  Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); accord 20 C.F.R. § 404.1520 (codifying the five-step analytical framework).  The process is one of sequential evaluation, such that if the Commissioner is able to make a specified conclusive determination regarding the claimant's disability at a given step, there is no need to perform the analysis set forth under the next successive step.  See 20 C.F.R. § 404.1520(4).

At step one, a claimant's work activity is considered.  See 20 C.F.R. § 404.1520(4)(i).  A finding of "not disabled" is warranted if the claimant is engaged in substantial gainful activity. See id.; accord Draegert, 311 F.3d at 472.  If the claimant is not engaged in substantial gainful activity, the analysis proceeds to step two, at which the medical severity of the claimant's impairments is evaluated.  See 20 C.F.R. § 404.1520(4)(ii); accord DeChirico v. Callahan, 134 F.3d 1177, 1179 (2d Cir. 1998).  If the claimant is found to suffer from a severe impairment or combination of impairments that is severe, the third step of the inquiry is performed to determine whether the claimant has an impairment or impairments that meet or equal the criteria listed in Appendix 1 to Subpart P of Part 404, Title 20 of the Code of Federal Regulations.  See 20 C.F.R. § 404.1520(4)(iii); DeChirico, 134 F.3d at 1179-80.  A finding of "disabled" must be made if all criteria for a listed impairment are met.  See id.  If the claimant's impairment or impairments cannot be equated with at least one of the impairments listed in Appendix 1, the analysis continues.

Before step four is performed, however, an assessment of the claimant's residual functional capacity is made. See 20 C.F.R, § 404.1520(4). This assessment is then used at both steps four and five. See id. At step four of the analysis, the claimant's ability to perform her past relevant work is evaluated; if the claimant is found to possess the residual functional capacity to perform such work, she is deemed "not disabled." See 20 C.F.R. § 404.1520(4)(iv); DeChirico, 134 F.3d at 1180.

Otherwise, the analysis proceeds to the fifth and last step, at which the Commissioner "consider[s][her] assessment of [the claimant's] residual functional capacity and [the claimant's] age, education, and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 404.1520(4)(v); accord 20 C.F.R. § 404.1560(c)(1); DeChirico, 134 F.3d at 1180. At this final step of the analysis, "the ALJ is required to consult with a vocational expert" if "a claimant has nonexertional limitations that significantly limit the range of work permitted by his exertional limitations." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986)). If the claimant is found to possess the residual functional capacity to perform other work that exists in significant numbers in the national economy, a finding of "not disabled" is made; otherwise, a finding of "disabled" is made. See 20 C.F.R. § 404.1560(c); see also 20 C.F.R. § 404.1520(4)(v). "The claimant bears the burden of proof as to the first four steps, while the Commissioner must prove the final one." DeChirico, 134 F.3d at 1180 (internal citation omitted); accord 20 C.F.R. § 404.1560(c)(2) ("In order to support a finding that you are not disabled at [the] fifth step of the sequential evaluation process, we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors.")

C.    **ALJ Decision**

On September 5, 2012, ALJ Donagy issued a decision denying Plaintiff's application for disability benefits. (R. 6-19). Applying the five-step sequential evaluation process, the ALJ found at step one that Plaintiff "has not engaged in substantial gainful activity since November 23, 2008, the alleged onset date." (R. 11). Proceeding to step two, the ALJ concluded that "the claimant has the following severe impairments: HIV and hepatitis C." (R 11). The ALJ found that Plaintiff's depression, history of substance abuse, hypertension, and hemorrhoids were non-severe impairments because, considered singly and in combination, they did not cause more than minimal limitation in his ability to perform basic work activities. (R. 11). The ALJ also found little evidence that Plaintiff's alleged mood swings caused significant impairment. (R. 11) The ALJ noted that Plaintiff testified he discontinued Lexapro over concerns about its effect on his liver and that he claimed sobriety since May 2012. (R. 11).

At step three of the analysis, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 12). The ALJ also determined that Plaintiff had the residual functional capacity to perform the "full range of light work as defined in 20 CFR 404.1567(b) and 20 CFR 416.967(b)." (R. 12). In making these findings, the ALJ stated that her "review of the entire record indicated that no treating or examining physician issued a medically supported opinion that the claimant was totally disabled from work." (R. 13). The ALJ also considered Plaintiff's testimony at the hearing that he was unable to work due to his condition and that he was terminated from his last job due to mood swings. (R. 13). The ALJ noted, however, that Plaintiff reported receiving no psychiatric treatment and had no problems using public transportation, performing household chores, or handling his personal care. (R. 13). In light of Plaintiff's "relatively conservative medical treatment history, his testimony concerning his activities of daily living and past jobs, his retained exertional capacity,

and objective medical evidence which reflected minimal or stabilized medical conditions," the ALJ determined that Plaintiff was not disabled within the meaning of the Act.  (R. 13).

At step four of the analysis, the ALJ found that Plaintiff "is capable of performing past relevant work as a cashier or as a sales associate.  This work does not require the performance of work related activities precluded by [his] residual functional capacity."  (R. 14).  Nevertheless, the ALJ proceeded to step five, finding in the alternative that other jobs existed in significant numbers in the national economy that Plaintiff could perform, given his age, education, work experience, and residual functional capacity.  (R. 14 (citing 20 C.F.R Part 404, Subpart P, Appendix 2, Rule 202.21)).

In this case, the Court is satisfied that the ALJ applied the correct legal principles in her decision.  She noted at the outset that "the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled," and cited to the regulations setting forth that process.  (R. 10).  The ALJ then thoroughly discussed the regulations relevant to each step before determining that Plaintiff was not disabled within the meaning of the Act.

The Court has also reviewed the Administrative Record and finds that the ALJ's determinations were supported by substantial evidence.  The record indicates that Plaintiff's asymptomatic HIV infection was stable on Atripla with manageable side effects and that his hepatitis C was not causing limitations.  Although there is evidence that Plaintiff abused alcohol and at various times used marijuana and cocaine, he declined psychiatric treatment or other counseling services on multiple occasions.  Additionally, there is substantial evidence in the record, including Plaintiff's testimony, that he was able to care for himself, remember his medications, use public transportation, and – on a typical day – walk around Central Park, rest on a bench, then go to the library to use the computers.  While there is medical evidence to support

an injury to Plaintiff's right knee, he was not taking any pain medication or otherwise treating it, despite visiting the sports medicine clinic at Bellevue.  Indeed, none of Plaintiff's treating physicians opined that Plaintiff had notable limitations.

**IV.      CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ applied the correct legal principles in making her determination and that the determination was supported by substantial evidence.  Accordingly, Commissioner's motion for judgment on the pleadings (Docket No. 12) is GRANTED and this action is dismissed.  The Clerk of Court is directed to enter judgment in favor of the defendant and to close this case.

**SO ORDERED.**

_____**/S/**_____
SANDRA L. TOWNES
United States District Judge

Dated: May 31, 2014
        Brooklyn, New York